Citation Nr: 1508854 
Decision Date: 02/27/15 Archive Date: 03/11/15

DOCKET NO. 09-15 065 ) DATE
 )
 )

On appeal from the
Department of Veterans Affairs Regional Office in San Diego, California


THE ISSUES

1. Entitlement to service connection for residuals of transitional cell carcinoma of the bladder and invasion into the prostate, status post radical cystoprostatectomy with loss of use of kidney (hereinafter "residuals of bladder cancer"), to include as secondary to exposure to ionizing radiation and/or herbicides.

2. Entitlement to service connection for impotency, to include as secondary to residuals of bladder cancer. 

3. Entitlement to service connection for kidney failure, to include as secondary to residuals of bladder cancer.

4. Entitlement to service connection for heart disease, open heart surgery, angioplasty, and congestive heart failure, to include as secondary to exposure to ionizing radiation and/or herbicides.

5. Entitlement to service connection for hypertension, to include as secondary to exposure to ionizing radiation and/or herbicides.

6. Entitlement to service connection for carotid artery surgery, to include as secondary to exposure to ionizing radiation and/or herbicides.

7. Entitlement to service connection for peripheral vascular disease (PVD), to include as secondary to exposure to ionizing radiation and/or herbicides.

8. Entitlement to service connection for chronic anemia, to include as secondary to exposure to ionizing radiation and/or herbicides.

9. Entitlement to service connection for skin cancer, to include as secondary to exposure to ionizing radiation and/or herbicides.

10. Entitlement to service connection for hyperparathyroidism, to include as secondary to exposure to ionizing radiation and/or herbicides.

11. Entitlement to service connection for cataracts, to include as secondary to exposure to ionizing radiation and/or herbicides.

12. Entitlement to service connection for chronic obstructive pulmonary disease (COPD), to include as secondary to exposure to ionizing radiation and/or herbicides.

13. Entitlement to service connection for gout, to include as secondary to exposure to ionizing radiation and/or herbicides.

14. Entitlement to service connection for a total disability evaluation based on individual unemployability (TDIU).

15. Entitlement to service connection for special monthly compensation (SMC) based on housebound criteria. 



REPRESENTATION

Veteran represented by: Disabled American Veterans


WITNESSES AT HEARING ON APPEAL

Veteran and spouse


ATTORNEY FOR THE BOARD

Journet Shaw, Associate Counsel


INTRODUCTION

The Veteran served on active duty from January 1952 to August 1976.

This matter comes before the Board of Veterans' Appeals (Board) on appeal from rating decisions in September 2007 and May 2012 by the Department of Veterans Affairs (VA) Regional Office (RO) in Jackson, Mississippi and San, Diego, California, respectively.

Even though the Veteran had previously filed service connection claims for residuals of bladder cancer and impotency, in the September 2007 rating decision, the RO treated those claims as claims for reconsideration. Rather than impose an additional burden upon the Veteran to produce new and material evidence to reopen his service connection claims, and because the Board would ultimately reopen his claims, the Board finds that it will proceed to adjudicate his service connection claims for residuals of bladder cancer and impotency on the merits. 

The Veteran and his wife testified before the undersigned Veterans Law Judge at a January 2015 videoconference hearing. A transcript of this hearing is in the Virtual VA paperless claims file associated with the Veteran's appeal.

Following the last adjudication of the case by the Agency of Original Jurisdiction (AOJ) in an August 2014 statement of the case (SOC), additional pertinent evidence was added to the Veteran's claims file. The Veteran filed his substantive appeal in August 2014. Accordingly, under the Honoring America's Veterans and Caring for Camp Lejeune Families Act of 2012, this evidence is subject to initial review by the Board because the Veteran did not request in writing that the AOJ initially review such evidence. See 38 U.S.C.A. § 7105(e)(1) (West 2014).

This appeal has been processed through the Veterans Benefits Management System (VBMS) electronic paperless appeals processing system.

This appeal has been advanced on the Board's docket pursuant to 38 C.F.R. § 20.900(c). 38 U.S.C.A. § 7107(a)(2) (West 2014).

The issues of entitlement to service connection for hypertension, carotid artery surgery, PVD, chronic anemia, skin cancer, hyperparathyroidism, cataracts, COPD, and gout; entitlement to a TDIU; and entitlement to SMC based on housebound criteria are addressed in the REMAND portion of the decision below and are REMANDED to the AOJ.


FINDINGS OF FACT

1. The Veteran was exposed to ionizing radiation during active duty service. 

2. The Veteran's residuals of bladder cancer are etiologically related to his exposure to ionizing radiation. 

3. The Veteran's impotency was caused by his residuals of bladder cancer. 

4. The Veteran's kidney failure was caused by his residuals of bladder cancer. 

5. The Veteran's acute ischemic heart disease is etiologically related to his exposure to herbicides during active duty service in Thailand. 


CONCLUSIONS OF LAW

1. The criteria to establish service connection for residuals of bladder cancer, to include as secondary to exposure to ionizing radiation, have been met. 38 U.S.C.A. §§ 1101, 1110, 1112, 1113, 5103A, 5107 (West 2014); 38 C.F.R. §§ 3.102, 3.159, 3.303, 3.304, 3.307, 3.309, 3.311 (2014).

2. The criteria to establish service connection for impotency, to include as secondary to residuals of bladder cancer, have been met. 38 U.S.C.A. §§ 1110, 5107 (West 2014); 38 C.F.R. §§ 3.102, 3.303, 3.304, 3.310 (2014).

3. The criteria to establish service connection for kidney failure, to include as secondary to residuals of bladder cancer, have been met. 38 U.S.C.A. §§ 1110, 5107 (West 2014); 38 C.F.R. §§ 3.102, 3.303, 3.304, 3.310 (2014).

4. The criteria to establish service connection for acute ischemic heart disease, to include as secondary to exposure to herbicides, have been met. 38 U.S.C.A. §§ 1101, 1110, 1112, 1113, 1116, 5103A, 5107 (West 2014); 38 C.F.R. §§ 3.102, 3.159, 3.303, 3.304, 3.307, 3.309, 3.311 (2014).


REASONS AND BASES FOR FINDINGS AND CONCLUSIONS

The Veterans Claims Assistance Act of 2000 (VCAA) describes VA's duty to notify and assist claimants in substantiating a claim for VA benefits. 38 U.S.C.A. §§ 5100, 5102, 5103, 5103A, 5107, 5126 (West 2014); 38 C.F.R. §§ 3.102, 3.156(a), 3.159, 3.326(a) (2014).

Given the Board's favorable decision in granting service connection for residuals of bladder cancer, impotency, kidney failure, and acute ischemic heart disease, the Board finds that all notification and development actions needed to fairly adjudicate the appeal have been accomplished.

I. Service Connection

Laws and Regulations

Service connection may be established for a disability resulting from disease or injury incurred in or aggravated by active service. 38 U.S.C.A. § 1110; 38 C.F.R. § 3.303(a). 

In order to establish service connection for a claimed disorder on a direct basis, there must be competent evidence of (1) a current disability; (2) in-service incurrence or aggravation of a disease or injury; and (3) a causal relationship between the current disability and the disease or injury incurred or aggravated during service. See Shedden v. Principi, 381 F.3d 1163, 1166-67 (Fed. Cir. 2004).

Service connection for disorders claimed as due to exposure to ionizing radiation may be established in three different ways: (a) for radiation-exposed veterans, on a presumptive basis; (b) for radiogenic disease, on a direct basis after specified development procedures are conducted, or; (c) on a direct basis by showing that the disease was incurred during or aggravated by service. The Board will address each of these means of establishing service connection. 

With respect to the first of the above-described methods of establishing service connection, "radiation-exposed veteran" means a veteran who participated in a "radiation-risk activity." See 38 U.S.C.A. § 1112(c)(3)(A) (West 2014); 38 C.F.R. § 3.309(d)(3)(i) (2014). "Radiation-risk activity" means: onsite participation in a test involving the atmospheric detonation of a nuclear device; the occupation of Hiroshima or Nagasaki, Japan, during the period beginning on August 6, 1945, and ending on July 1, 1946; internment as a prisoner of war of Japan during World War II resulting in an opportunity for exposure to radiation comparable to those occupying Hiroshima or Nagasaki; certain service on the grounds of a gaseous diffusion plant in Paducah, Kentucky, Portsmouth, Ohio, or at area K25 at Oak Ridge, Tennessee; or certain service on Amchitka Island, Alaska. See 38 U.S.C.A. § 1112(c)(3)(B) (West 2014); 38 C.F.R. § 3.309(d)(3)(ii) (2014). In the instant case, the evidence of record does not establish, and the Veteran does not claim, that he participated in any of these activities. The Veteran is not a "radiation-exposed veteran," and presumptive service connection under 38 U.S.C.A. § 1112(c) and 38 C.F.R. § 3.309(d) is, therefore, not warranted. 

With respect to the second of the above-described methods of establishing service connection, even if a claimant does not qualify as a "radiation-exposed veteran," service connection can still be established under 38 C.F.R. § 3.303(d) with the assistance of the procedural advantages prescribed in 38 C.F.R. § 3.311 if the condition at issue is a radiogenic disease. To consider a claim under 38 C.F.R. § 3.311, the evidence must show that: (1) the veteran was exposed to ionizing radiation in service; (2) the veteran subsequently developed a radiogenic disease; and (3) such disease first became manifest within a period specified by the regulation. See 38 C.F.R. § 3.311(b) (2014). "Radiogenic disease" means a disease that may be induced by ionizing radiation and includes, in pertinent part, urinary bladder cancer; such condition must have become manifest five years or more after exposure. See 38 C.F.R. § 3.311(b) (2014). These provisions apply in this case because the evidence indicates that the Veteran had urinary bladder cancer, a radiogenic disease, which first manifested in 1989, more than five years after the Veteran's reported in-service exposure to ionizing radiation. 

Section 3.311(a) calls for the development of a radiation dose assessment when it is established that a radiogenic disease first became manifest after service, where it was not manifest to a compensable degree within any applicable presumptive period specified in either 38 C.F.R. § 3.307 or § 3.309, and when it is contended that the disease is a result of ionizing radiation in service. Dose data will be requested from the Department of Defense in claims based upon participation in atmospheric nuclear testing and in claims based upon participation in the American occupation of Hiroshima or Nagasaki, Japan, prior to July 1, 1946. See 38 C.F.R. § 3.311(a)(2) (2014). In all other claims involving radiation exposure, the VA Under Secretary for Health will be responsible for preparation of a dose estimate, to the extent feasible, based on available methodologies. Id.

Pertinent law further provides that a Veteran who served in the Republic of Vietnam during the Vietnam era shall be presumed to have been exposed during such service to an herbicide agent. 38 U.S.C.A. § 1116 (West 2014); 38 C.F.R. § 3.307(a)(6)(iii) (2014). For purposes of application of this legal presumption, service in the Republic of Vietnam means actual service in-country in Vietnam from January 9, 1962 through May 7, 1975, and includes service in the waters offshore, or service in other locations if the conditions of service involved duty or visitation in the Republic of Vietnam. 38 C.F.R. §§ 3.307(a)(6)(iii), 3.313(a) (2014).

VA regulations provide for presumptive service connection for specific diseases associated with exposure to herbicide agents. Those diseases that are listed at 38 C.F.R. § 3.309(e), including ischemic heart disease, shall be presumptively service-connected if there are circumstances establishing herbicide agent exposure during active military service, even though there is no record of such disease during service. Generally, the regulation applies where an enumerated disease becomes manifest to a degree of 10 percent or more at any time after service. 38 C.F.R. § 3.307(a)(6)(ii).

While all Veterans who served in the Republic of Vietnam during the Vietnam era are presumed to have been exposed to an herbicide agent, VA has established a procedure for verifying exposure to herbicides in Thailand during the Vietnam era. VA has determined that there was significant use of herbicides on the fenced-in perimeters of military bases in Thailand intended to eliminate vegetation and ground cover for base security purposes, as evidenced in a declassified Vietnam era Department of Defense document titled "Project CHECO Southeast Asia Report: Base Defense in Thailand." Special consideration of herbicide exposure on a facts-found or direct basis should be extended to those Veterans whose duties placed them on or near the perimeters of Thailand military bases. That allows for presumptive service connection of the diseases associated with herbicide exposure. VA Adjudication Manual, M21-1MR, Part IV, Subpart ii, Chapter 2, Section C ("M21-1MR").

The majority of troops in Thailand during the Vietnam era were stationed at the Royal Thai Air Force Bases of U-Tapao, Ubon, Nakhon Phanom, Udorn, Takhli, Korat, and Don Muang. If a Veteran served on one of those air bases as a security policeman, security patrol dog handler, member of a security police squadron, or otherwise served near the air base perimeter, as shown by MOS (military occupational specialty), performance evaluations, or other credible evidence, then herbicide exposure should be acknowledged on a facts found or direct basis. However, that applies only during the Vietnam era, from February 28, 1961, to May 7, 1975. M21-1MR, Part IV, Subpart ii, Chapter 2, Section C.10.(q). 

Certain chronic diseases, including cancer, may be presumed to have been incurred in or aggravated by service if manifest to a compensable degree within one year of discharge from service. See 38 U.S.C.A. §§ 1101, 1112 (West 2014); 38 C.F.R. §§ 3.307, 3.309 (2014). 

A claim for secondary service connection requires medical evidence that connects the asserted secondary disability to the service-connected disability. Velez v. West, 11 Vet. App. 148, 158 (1998). In order to establish entitlement to service connection on this secondary basis, there must be (1) evidence of a current disability; (2) evidence of a service-connected disability; and (3) medical evidence establishing a link between the service-connected disability and the current disability. See Wallin v. West, 11 Vet. App. 509, 512 (1998).

A disability which is proximately due to or the result of a service-connected disease or injury shall be service connected. When service connection is thus established for a secondary condition, the secondary condition shall be considered a part of the original condition. 38 C.F.R. § 3.310(a). Secondary service connection may also be established for a nonservice-connected disability which is aggravated by a service connected disability. In such an instance, the Veteran may be compensated for the degree of disability over and above the degree of disability existing prior to the aggravation. 38 C.F.R. § 3.310(b) (2014); see Allen v. Brown, 7 Vet. App. 439, 448 (1995).

Notwithstanding the provisions relating to presumptive service connection, secondary service condition, or exposure to ionizing radiation, a Veteran may establish service connection for a disability with proof of actual direct causation. Combee v. Brown, 34 F.3d 1039 (Fed. Cir. 1994).

 Analysis - Ionizing Radiation Claims

The Veteran contends that he developed bladder cancer as a result of his exposure to ionizing radiation while serving aboard several nuclear submarine repair ships. Since the Veteran was diagnosed with bladder cancer in 1989, the Veteran asserts that his health has deteriorated and resulted in additional medical problems. He said that the surgery to remove his bladder and prostate made him impotent. Later, he experienced a urinary tract infection within his artificial bladder that caused him to have kidney failure. See June 2007, August 2007, and January 2008 statements and January 2015 Board hearing transcript. 

With regard to the Veteran's assertions that he was exposed to ionizing radiation, the Board finds that the Veteran's military personnel records do reflect his service aboard naval ships where he was exposed to ionizing radiation. His DD Form 1141 (Record of Occupational Exposure to Ionizing Radiation) reflects that he was occupationally exposed to an estimated dose of ionizing radiation of 0.039 rem. An August 2007 dose assessment, performed by the Chief Public Health and Environmental Hazards Officer (PHEHO), reflects that there is convincing evidence linking bladder cancer to radiation exposure. Using a computer program, the Chief PHEHO estimated the likelihood that the Veteran's level of radiation exposure during service caused his bladder cancer at a probability of 0.04 percent. Based upon the Chief PHEHO's findings and the other evidence of record, the Director of Compensation and Pension Service (CPS) opined that there was no reasonable possibility that the Veteran's bladder cancer was the result of his occupational exposure to ionizing radiation during service. See August 2007 CPS opinion.

The Veteran's private treatment records reflect that he was diagnosed with bladder cancer in 1989 and had chemotherapy. In 1991, the Veteran underwent a radical cystoprostatectomy (removal of the urinary bladder and prostate gland) with an Indiana pouch (a surgically-created urinary diversion used to create a way for the body to store and eliminate urine). Dr. Kranc, the Veteran's private treating physician, explained that, during the Veteran's radical prostatectomy, the nerves that supply his penis to provide an erection were also removed. Dr. Kranc said that the Veteran had organic erectile dysfunction and that he would never be able to have an erection without some type of pharmacologic or mechanical means. See January 2006 statement of Dr. Kranc and April 2007 private treatment record. 

The Veteran's private treating physician, Dr. Elsharkawi, documented that the Veteran had sustained a severe bladder infection in October 2007, which precipitated irreversible kidney damage. His condition now required regular dialysis treatments. See December 2007 and June 2009 statements of Dr. Elsharkawi.

In a June 2014 statement, the Veteran's private treating physician, Dr. Sharf, opined that the Veteran's bladder cancer was a direct result of his exposure to Ionizing Radiation while serving on active duty. Dr. Sharf explained that even though the Veteran was exposed to a low-level dose of ionizing radiation, such radiation still caused his cancer. He said that "any and all exposures to Ionizing Radiation may cause cancer no matter the dose level." Dr. Sharf cited to a study performed by John W. Gofman, Professor Emeritus of Molecular and Cell Biology in the Department of Medicine, University of California at Berkeley that "determined and documented there is no threshold dose-level (no safe dose, no risk-free dose of Ionizing Radiation." 

Based on a review of all of the evidence of record, the evidence demonstrates that the Veteran was exposed to ionizing radiation while serving aboard nuclear naval ships during his active duty service. The Veteran has a current diagnosis of residuals of bladder cancer, a radiogenic disease, which first manifested more than 20 years after his last ionizing radiation exposure. The Veteran's private treating physician, Dr. Sharf, found that the Veteran's bladder cancer was a direct result of his exposure to ionizing radiation. There are conflicting opinions as to whether the Veteran's level of radiation exposure was sufficient to have caused his bladder cancer. However, the Board finds that Dr. Sharf's opinion was based on a fully articulated rationale and supported by medical literature. Therefore, the Board finds that resolving all reasonable doubt in favor of the Veteran, the Veteran's service connection claim for residuals of bladder cancer as secondary to his exposure to ionizing radiation is warranted. See 38 U.S.C.A. § 5107(b) (West 2014); 38 C.F.R. § 3.102 (2014).

Finally, as the evidence demonstrates that the Veteran's impotency and kidney failure were the result of his bladder cancer, the Veteran is also entitled to service connection for these disabilities as secondary to his residuals of bladder cancer. 

Based on the grant of service connection for impotency and the medical evidence showing that the Veteran experienced organic erectile dysfunction following surgery, the Veteran will be qualified to receive special monthly compensation for loss of use of a creative organ under the provisions of 38 U.S.C.A. § 1114(k) (West 2014). 

 Analysis - Herbicide Exposure Claims

In addition to exposure to ionizing radiation, the Veteran argues that he was exposed to herbicides while serving on the U-Tapao U.S. Air Force Base in Thailand from June 1975 to July 1976. He said that he was assigned to the Defense Property Disposal Office located on the back corner of the security perimeter of the air base. As part of his duties, the Veteran testified that he was responsible for maintaining the security of that perimeter of the compound. He said that herbicides were used along the perimeter of the base to control the growth of weeds and grass. As a result of his herbicide exposure, the Veteran argues that he developed various health problems, including acute ischemic heart disease. See February 2011 and August 2014 statements and January 2015 Board hearing transcript. 

The Veteran's military personnel records reflect that from July 1975 to July 1976, he served as Chief Defense Disposal Property Officer at the Royal Thai U-Tapao U.S. Air Force Base in Thailand. The personnel records do not dispute the Veteran's contentions that he was responsible for security along the perimeter of the base. 

The Veteran's private treatment records reflect that the Veteran has had coronary artery disease (also known as ischemic heart disease) since September 2007 when he had a myocardial infraction due to a urinary tract infection. In May 2008, the Veteran underwent a quadruple coronary artery bypass. See December 2007 statement of Dr. Elsharkawi and May 2008 discharge summary. The Veteran has been subsequently diagnosed with congestive heart failure. See January 2011 private treatment record. 

In a June 2014 statement, the Veteran's private treating physician, Dr. Sharf, found that the Veteran's acute ischemic heart disease was a direct result of his exposure to herbicides during active duty service. Dr. Sharf noted that the Veteran had been exposed to the herbicides while working on a daily basis along the perimeter of the U-Tapao Air Force Base that had been sprayed routinely with herbicides. 

Based on a review of the all of the evidence of record, the Veteran has a current diagnosis for acute ischemic heart disease. The Board finds that, based on the circumstances of the Veteran's service working as a security officer along the perimeter of U-Tapao U.S. Air Force Base in Thailand, the Veteran was exposed to herbicides. The Veteran served in Thailand after the presumptive time period for herbicide exposure under VA regulations, so the Veteran is not entitled to service connection on a presumptive basis. Nevertheless, the Veteran submitted a medical opinion from his private treating physician, a board certified cardiologist, who found that his currently diagnosed acute ischemic heart disease was caused by his in-service herbicide exposure. The Board finds that, resolving all reasonable doubt in favor of the Veteran, the evidence demonstrates that the Veteran's acute ischemic heart disease is etiologically related to his active duty service, and therefore, his service connection claim is granted. See 38 U.S.C.A. § 5107(b); 38 C.F.R. § 3.102.



ORDER

Entitlement to service connection for residuals of bladder cancer is granted. 

Entitlement to service connection for impotency is granted.

Entitlement to service connection for kidney failure is granted.

Entitlement to service connection for acute ischemic heart disease is granted.


REMAND

Unfortunately, a remand is required in this case for the issues remaining on appeal. Although the Board sincerely regrets the additional delay, it is necessary to ensure that there is a complete record upon which to decide the Veteran's claim so that the Veteran is afforded every possible consideration.

The Veteran is also seeking entitlement to service connection for hypertension, carotid artery surgery, PVD, chronic anemia, skin cancer, hyperparathyroidism, and cataracts; entitlement to a TDIU; and entitlement to SMC based on housebound criteria. 

The Veteran was not afforded VA examinations for his claimed disabilities for hypertension, carotid artery surgery, PVD, chronic anemia, skin cancer, hyperthyroidism, and cataracts. The Veteran contends that these disabilities all developed as a result of his bladder cancer, or alternatively, as associated with his in-service exposure to ionizing radiation and/or herbicides. As the Veteran has been shown to have been exposed to ionizing radiation and herbicides during his service, VA examinations to determine the nature and likely etiology of these disabilities are required. 

The Veteran's claims for entitlement to a TDIU and entitlement to SMC based on housebound criteria are inextricably intertwined with his claims for service connection. See Harris v. Derwinski, 1 Vet. App. 180, 183 (1991). Therefore, the TDIU claim and SMC claim must also be remanded. 

Finally, the Veteran indicated in an August 2014 VA Form 9 that he wished to appeal his claims for service connection for COPD and gout; claims that had been denied in an August 2014 rating decision. The Board construes this statement, which was one filed within one year of the rating decision, as a timely filed notice of disagreement. 38 U.S.C.A. § 7105(b) (West 2014). Therefore, the Veteran is entitled to be furnished a statement of the case (SOC) which addresses these issues. See Manlincon v. West, 12 Vet. App. 238 (1999). These matter are, therefore, remanded for issuance of a SOC.

Accordingly, the case is REMANDED for the following action:

(Please note, this appeal has been advanced on the Board's docket pursuant to 38 C.F.R. § 20.900(c). Expedited handling is requested.)

1. The AOJ should obtain all of the Veteran's outstanding treatment records for his hypertension, peripheral vascular disease, carotid artery surgery, chronic anemia, skin cancer, hyperparathyroidism, and cataracts that are not currently of record. The Veteran must be provided with the necessary authorizations for the release of any treatment records. The AOJ must then obtain and associate the records with the electronic claims file.

2. When the above development has been completed, to the extent possible, the AOJ should schedule the Veteran for a VA examination by an appropriately qualified examiner to determine the nature and etiology of the Veteran's hypertension. The examiner should be provided access to the Veteran's electronic claims file, including a copy of this REMAND. All appropriate testing should be conducted. 

After a review of the record on appeal, the examiner should respond to the following:

a. Is it at least as likely as not (50 percent probability or more) that the Veteran's hypertension had its clinical onset during active duty service or is related to any in-service disease, injury, or event, including exposure to ionizing radiation and/or herbicides during service? 

b. Or, is it at least as likely as not (50 percent probability or more) that the Veteran's hypertension was caused or permanently aggravated by (worsened beyond the natural progression of such disorder) his service-connected disabilities, including residuals of bladder cancer, impotency, kidney failure, or acute ischemic heart disease? 

The VA examiner should be informed that the Veteran has been found to have been exposed to ionizing radiation and herbicides during his active duty service. 

All examination findings, along with the complete rationale for all opinions expressed, should be discussed in the examination report.

3. In conjunction with the above, the AOJ should schedule the Veteran for a VA examination by an appropriately qualified examiner to determine the nature and etiology of the Veteran's peripheral vascular disease. The examiner should be provided access to the Veteran's electronic claims file, including a copy of this REMAND. All appropriate testing should be conducted. 

After a review of the record on appeal, the examiner should respond to the following:

a. Is it at least as likely as not (50 percent probability or more) that the Veteran's peripheral vascular disease had its clinical onset during active duty service or is related to any in-service disease, injury, or event, including exposure to ionizing radiation and/or herbicides during service? 

b. Or, is it at least as likely as not (50 percent probability or more) that the Veteran's peripheral vascular disease was caused or permanently aggravated by (worsened beyond the natural progression of such disorder) his service-connected disabilities, including residuals of bladder cancer, impotency, kidney failure, or acute ischemic heart disease? 

The VA examiner should be informed that the Veteran has been found to have been exposed to ionizing radiation and herbicides during his active duty service. 

All examination findings, along with the complete rationale for all opinions expressed, should be discussed in the examination report.

4. In conjunction with the above, the AOJ should schedule the Veteran for VA examination by an appropriately qualified examiner to determine the nature and etiology of the Veteran's carotid artery surgery. The examiner should be provided access to the Veteran's electronic claims file, including a copy of this REMAND. All appropriate testing should be conducted. 

After a review of the record on appeal, the examiner should respond to the following:

a. Does the Veteran have any current residuals of his carotid artery surgery? If so, please identify such residuals.

b. Is it at least as likely as not (50 percent probability or more) that any current residuals of the Veteran's carotid artery surgery had its clinical onset during active duty service or is related to any in-service disease, injury, or event, including exposure to ionizing radiation and/or herbicides during service? 

c. Or, is it at least as likely as not (50 percent probability or more) that any current residuals of the Veteran's carotid artery surgery was caused or permanently aggravated by (worsened beyond the natural progression of such disorder) his service-connected disabilities, including residuals of bladder cancer, impotency, kidney failure, or acute ischemic heart disease? 

The VA examiner should be informed that the Veteran has been found to have been exposed to ionizing radiation and herbicides during his active duty service. 

All examination findings, along with the complete rationale for all opinions expressed, should be discussed in the examination report.

5. In conjunction with the above, the AOJ should schedule the Veteran for a VA examination by an appropriately qualified examiner to determine the nature and etiology of the Veteran's chronic anemia. The examiner should be provided access to the Veteran's electronic claims file, including a copy of this REMAND. All appropriate testing should be conducted. 

After a review of the record on appeal, the examiner should respond to the following:

a. Is it at least as likely as not (50 percent probability or more) that the Veteran's chronic anemia had its clinical onset during active duty service or is related to any in-service disease, injury, or event, including exposure to ionizing radiation and/or herbicides during service? 

b. Or, is it at least as likely as not (50 percent probability or more) that the Veteran's chronic anemia was caused or permanently aggravated by (worsened beyond the natural progression of such disorder) his service-connected disabilities, including residuals of bladder cancer, impotency, kidney failure, or acute ischemic heart disease? 

The VA examiner should be informed that the Veteran has been found to have been exposed to ionizing radiation and herbicides during his active duty service. 

All examination findings, along with the complete rationale for all opinions expressed, should be discussed in the examination report.

6. In conjunction with the above, the AOJ should schedule the Veteran for a VA examination by an appropriately qualified examiner to determine the nature and etiology of the Veteran's skin cancer. The examiner should be provided access to the Veteran's electronic claims file, including a copy of this REMAND. All appropriate testing should be conducted. 

After a review of the record on appeal, the examiner should respond to the following:

a. Does the Veteran have a current skin cancer diagnosis? If so, please identify each diagnosis. 

b. Is it at least as likely as not (50 percent probability or more) that any diagnosed skin cancer had its clinical onset during active duty service or is related to any in-service disease, injury, or event, including exposure to ionizing radiation and/or herbicides during service? 

c. Or, is it at least as likely as not (50 percent probability or more) that any diagnosed skin cancer was caused or permanently aggravated by (worsened beyond the natural progression of such disorder) the Veteran's service-connected disabilities, including residuals of bladder cancer, impotency, kidney failure, or acute ischemic heart disease? 

The VA examiner should be informed that the Veteran has been found to have been exposed to ionizing radiation and herbicides during his active duty service. 

All examination findings, along with the complete rationale for all opinions expressed, should be discussed in the examination report.

7. In conjunction with the above, the AOJ should schedule the Veteran for a VA examination by an appropriately qualified examiner to determine the nature and etiology of the Veteran's hyperparathyroidism. The examiner should be provided access to the Veteran's electronic claims file, including a copy of this REMAND. All appropriate testing should be conducted. 

After a review of the record on appeal, the examiner should respond to the following:

a. Is it at least as likely as not (50 percent probability or more) that the Veteran's hyperparathyroidism had its clinical onset during active duty service or is related to any in-service disease, injury, or event, including exposure to ionizing radiation and/or herbicides during service? 

b. Or, is it at least as likely as not (50 percent probability or more) that the Veteran's hyperparathyroidism was caused or permanently aggravated by (worsened beyond the natural progression of such disorder) his service-connected disabilities, including residuals of bladder cancer, impotency, kidney failure, or acute ischemic heart disease? 

The VA examiner should be informed that the Veteran has been found to have been exposed to ionizing radiation and herbicides during his active duty service. 

All examination findings, along with the complete rationale for all opinions expressed, should be discussed in the examination report.

8. In conjunction with the above, the AOJ should schedule the Veteran for a VA examination by an appropriately qualified examiner to determine the nature and etiology of the Veteran's cataracts. The examiner should be provided access to the Veteran's electronic claims file, including a copy of this REMAND. All appropriate testing should be conducted. 

After a review of the record on appeal, the examiner should respond to the following:

a. Does the Veteran have a current diagnosis for cataracts?

b. Is it at least as likely as not (50 percent probability or more) that the Veteran's cataracts had its clinical onset during active duty service or is related to any in-service disease, injury, or event, including exposure to ionizing radiation and/or herbicides during service? 

b. Or, is it at least as likely as not (50 percent probability or more) that the Veteran's cataracts was caused or permanently aggravated by (worsened beyond the natural progression of such disorder) his service-connected disabilities, including residuals of bladder cancer, impotency, kidney failure, or acute ischemic heart disease? 

The VA examiner should be informed that the Veteran has been found to have been exposed to ionizing radiation and herbicides during his active duty service. 

All examination findings, along with the complete rationale for all opinions expressed, should be discussed in the examination report.

9. The AOJ should furnish a SOC to the Veteran addressing the issues of entitlement to service connection for COPD and entitlement to service connection for gout. The Veteran and his representative must be advised of the need to file a timely Substantive Appeal following the issuance of the SOC if he wishes to complete an appeal of these issues from the August 2014 rating decision. These claims should be returned to the Board only if the Veteran perfects a timely appeal with respect to the denial of either of these claims. 

10. Then, the AOJ should review the claims file. If any of the directives specified in this remand have not been implemented, appropriate corrective action should be undertaken before readjudication. 

11. Then, the AOJ should readjudicate the claims of entitlement to service connection for hypertension, PVD, carotid artery surgery, chronic anemia, skin cancer, hyperparathyroidism, and cataracts; entitlement to a TDIU; and entitlement to SMC based on housebound criteria. If the Veteran's combined disability evaluation does not meet the regulatory criteria for consideration of a schedular TDIU, the AOJ MUST consider whether referral of the Veteran's TDIU request to the Director of Compensation Service for extraschedular consideration is appropriate. 38 C.F.R. §4.16(b) (2014). If the benefits sought on appeal remain denied, in whole or in part, the Veteran should be provided with a supplemental statement of the case (SSOC) and be afforded a reasonable opportunity to respond. The case should then be returned to the Board for further appellate review, if otherwise in order.

The Veteran has the right to submit additional evidence and argument on the matters the Board has remanded. Kutscherousky v. West, 12 Vet. App. 369 (1999).

This claim must be afforded expeditious treatment. The law requires that all claims that are remanded by the Board of Veterans' Appeals or by the United States Court of Appeals for Veterans Claims for additional development or other appropriate action must be handled in an expeditious manner. See 38 U.S.C.A. §§ 5109B, 7112 (West 2014).




______________________________________________
BRADLEY W. HENNINGS
Veterans Law Judge, Board of Veterans' Appeals

Department of Veterans Affairs